**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


Rene J. Morin

    v.                                     Civil No. 13-cv-220-LM
                                            Opinion No. 2014 DNH 009
Carolyn W. Colvin, Acting
Commissioner, Social Security
Administration


**O R D E R**


    Pursuant to 42 U.S.C. § 405(g), Rene Morin moves to reverse
the Acting Commissioner's decision to deny his application for
supplemental security income, or SSI, under Title XVI of the
Social Security Act, 42 U.S.C. § 1382.  The Acting Commissioner,
in turn, moves for an order affirming her decision.  For the
reasons that follow, this matter is remanded to the Acting
Commissioner for further proceedings consistent with this order.


**Standard of Review**

    The applicable standard of review in this case provides, in
pertinent part:

> The [district] court shall have power to enter, upon
> the pleadings and transcript of the record, a judgment
> affirming, modifying, or reversing the decision of the
> Commissioner of Social Security, with or without
> remanding the cause for a rehearing.  The findings of
> the Commissioner of Social Security as to any fact, if
> supported by substantial evidence, shall be conclusive
> . . . .

42 U.S.C. § 405(g) (setting out the standard of review for decisions on claims for disability insurance benefits); see also 42 U.S.C. § 1383(c)(3) (establishing § 405(g) as the standard of review for SSI decisions).  However, the court "must uphold a denial of social security . . . benefits unless 'the [Commissioner] has committed a legal or factual error in evaluating a particular claim.'"  Manso-Pizarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996) (quoting Sullivan v. Hudson, 490 U.S. 877, 885 (1989)).

As for the statutory requirement that the Commissioner's findings of fact be supported by substantial evidence, "[t]he substantial evidence test applies not only to findings of basic evidentiary facts, but also to inferences and conclusions drawn from such facts."  Alexandrou v. Sullivan, 764 F. Supp. 916, 917-18 (S.D.N.Y. 1991) (citing Levine v. Gardner, 360 F.2d 727, 730 (2d Cir. 1966)).  In turn, "[s]ubstantial evidence is 'more than [a] mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Currier v. Sec'y of HEW, 612 F.2d 594, 597 (1st Cir. 1980) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  But, "[i]t is the responsibility of the [Commissioner] to determine issues of credibility and to draw inferences from

the record evidence.  Indeed, the resolution of conflicts in the evidence is for the [Commissioner], not the courts." Irlanda Ortiz v. Sec'y of HHS, 955 F.2d 765, 769 (1st Cir. 1991) (citations omitted).  Moreover, the court "must uphold the [Commissioner's] conclusion, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Tsarelka v. Sec'y of HHS, 842 F.2d 529, 535 (1st Cir. 1988).  Finally, when determining whether the decision of the Acting Commissioner is supported by substantial evidence, the court must "review[] the evidence in the record as a whole." Irlanda Ortiz, 955 F.2d at 769 (quoting Rodriguez v. Sec'y of HHS, 647 F.2d 218, 222 (1st Cir. 1981)).

## Background

The parties have submitted a Joint Statement of Material Facts, document no. 17.  That statement is part of the court's record and will be summarized here, rather than repeated in full.

Morin was injured in an automobile accident in 1989.  As a result, he was unable to return to his employment as a drywall installer.  Thereafter, he was supported by his sister, for whom he provided various forms of household assistance.  That arrangement ended in July of 2012, when Morin's sister asked him to move out of her home, which rendered him essentially

homeless.  In 2007, Morin suffered a heart attack, and in June
of 2011, he suffered another cardiac incident that fell short of
a full-scale heart attack.[1]

Morin has been diagnosed with: (1) depressive disorder, not
elsewhere classified; post-traumatic stress disorder; and
generalized anxiety disorder: (2) depressive disorder, NOS;[2] and
(3) depressive disorder, NOS, rule out major depressive
disorder, single episode, severe;[3] rule out post-traumatic stress
disorder; generalized anxiety disorder; social anxiety disorder;
rule out attention deficit disorder; and cannabis dependence, in
remission.  His treatment has consisted of medication and
counseling.

In March of 2012, Dr. Darlene Gustavson performed a
consultative examination on Morin and completed a Mental Health
Evaluation Report on him.  Her examination included "[a] brief
mental status examination using the Folstein Mini Mental Status
Exam (MMSE) [on which Morin achieved a] score of 29/30,"

---

[1] The parties agree that Morin's physical impairments,
including his cardiac condition, are irrelevant to this appeal.

[2] "NOS" is an abbreviation of "not otherwise specified."
Webster's Third New International Dictionary 1542 (1993).

[3] In United States v. Grape, the Third Circuit explained
that "[a] 'rule-out' diagnosis, according to [a physician's
testimony], means that there is 'evidence that [the patient] may
meet the criteria for that diagnosis, but [the doctors] need
more information to rule it out," 549 F.3d 591, 594 n.2 (3d Cir.
2008) (brackets in the original).

Administrative Transcript ("hereinafter "Tr.") 334.  Based upon
her examination, Dr. Gustavson found that Morin was able to: (1)
"properly care for personal affairs, do shopping, cook, use
public transportation, pay bills, maintain his residence, and
care for grooming and hygiene," id. at 335; (2) "interact
appropriately and communicate effectively with family members,
neighbors, friends, landlord, fellow employees, and
supervisors," id.; (3) "understand and remember locations and
work-like procedures, to understand and remember very short and
simple as well as detailed instructions as demonstrated on the
MMSE and observations throughout the interview," id.; (4)
"sustain attention and concentration, persistence and pace and
to complete tasks as demonstrated on the MMSE and observations
during the interview," id. at 336; and (5) "tolerate stresses
common to a work environment which includes ability to make
decisions and interact with supervisors and consistently
maintain attendance and schedule," id.

In March of 2012, Dr. Laura Landerman, a state-agency
reviewing psychologist, conducted a Psychiatric Review Technique
assessment of Morin, based upon a review of his mental-health
records.  With respect to the "Paragraph B" criteria for
affective disorders, Listing 12.04, see 20 C.F.R. Pt. 404,
Subpt. P, App. 1 § 12.04B, Dr. Landerman determined that Morin

had no restriction of his activities of daily living; mild difficulties in maintaining both social functioning and concentration, persistence, or pace; and no repeated episodes of decompensation of extended duration.  See Tr. 71.

About a month after Dr. Gustavson examined Morin, and about two weeks after Dr. Landerman reviewed his mental-health records, Morin attempted suicide and was admitted to the psychiatric unit of the Elliot Hospital Emergency Department. He was discharged three days later.

In August of 2012, Morin's counsel directed a Mental Residual Functional Capacity ("RFC") Questionnaire to Shawne Diaz, a counselor at Elliot Behavioral Health Services ("Elliot BHS").  Diaz had provided Morin with counseling on seventeen occasions over the previous six months.  The completed questionnaire was signed by both Diaz and Dr. Kenneth Lerner, also of Elliot BHS.  Dr. Lerner began seeing Morin in the fall of 2011, referred him to Diaz in January of 2012, and continued to see him after the referral.  By the time he signed the questionnaire, Dr. Lerner had seen Morin ten times.  In the space on the questionnaire that asked for "Examination dates," the response is: "1-26-12 – 8-13-12," Tr. 338, a time span that corresponds with Diaz's treatment of Morin.  Between January and August of 2012, Diaz administered eighteen mental-status

6

examinations to Morin, and between November of 2011 and August of 2012, Dr. Lerner administered seven such examinations.

After Morin's counsel received the completed Mental RFC Questionnaire, he transmitted it to the Social Security Administration ("SSA") Office of Disability Adjudication and Review under cover of a letter that says, in pertinent part:

> Enclosed please find on behalf of our client, Rene Morin, the following evidentiary documents:
>
> - **Shawne Diaz, MA, LCMHC — Mental RFC Questionnaire co-signed by Dr. Kenneth Lerner — 8/16/12 (6 pages).**

Tr. 344 (boldface in the original).

Turning to the content of the Mental RFC Questionnaire, with regard to sixteen mental abilities and aptitudes required to perform unskilled work, Morin was rated as very good in one area, limited but satisfactory in five areas, and seriously limited but not precluded in five areas.  The questionnaire also indicated that Morin was unable to meet competitive standards in five areas: (1) maintaining attention for two-hour segments; (2) making simple work-related decisions; (3) completing a normal workday and workweek without interruptions from psychologically based symptoms; (4) performing at a consistent pace without an unreasonable number and length of rest periods; and (5) dealing with normal work stress.  See Tr. 340.  Finally, the

questionnaire indicated that as a result of Morin's mental impairments and/or treatment, he would be absent from work about three days per month.  See id.

In September of 2012, psychologist Robert Beaton reviewed Morin's records and completed a Mental RFC Worksheet, in connection with Morin's successful application for benefits from New Hampshire's APTD (Aid to the Permanently and Totally Disabled) program.  In the sixteen areas Dr. Beaton evaluated, he found no limitations in four, slight limitations in four, and moderate limitations in eight.  See Tr. 423.  The worksheet defines the term "moderately limited" to mean that "[t]he individual's capacity to perform the activity is impaired."  Id. The form also includes a fourth category, "markedly limited," which denotes that "[t]he individual cannot usefully perform or sustain the activity."  Id.  Dr. Beaton did not find that Morin suffered from any marked limitations.  See id.

After conducting a hearing, the ALJ issued a decision that includes the following relevant findings of fact and conclusions of law:

> 2.  The claimant has the following severe impairments: status post myocardial infarction in 2007, depressive disorder-NOS, generalized anxiety disorder and post traumatic stress disorder (20 CFR 416.920(c)).
>
> . . . .

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

.  .  .  .

4.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except the claimant needs to avoid environments requiring acute hearing or that have excessive background noise.  He is able to understand, remember and carry out simple 1-3 step tasks with oral instructions or very minimal written instructions.  He is limited from performing fast-paced production and from multi-tasking.  He can make routine workplace decisions and adapt to routine changes.  He can work one-on-one with regular customers, but cannot engage with the public as a whole.  He can work with co-workers and with supervisors in routine settings.

.  .  .  .

5.  The claimant has no past relevant work (20 CFR 416.965).

.  .  .  .

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

Tr. 6, 8, 10, 12, 13.  Based upon the testimony of a vocational expert ("VE"), the ALJ determined that Morin could work as a laundry folder/sorter, as an office cleaner, or as a flower-care worker.

**Discussion**

According to Morin, the ALJ's decision should be reversed, and the case remanded, because the ALJ: (1) did not properly evaluate the medical opinions of record when determining his RFC; (2) did not properly evaluate his subjective complaints and credibility; (3) did not properly consider the state's determination that he was eligible for APTD benefits; and (4) failed to carry the Acting Commissioner's burden of producing evidence of specific jobs in the national economy that he was capable of performing,[4] see Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing Arocho v. Sec'y of HHS, 670 F.2d 374, 375 (1st Cir. 1984)).  Morin's first argument is persuasive and dispositive.

A. The Legal Framework

To be eligible for supplemental security income, a person must be aged, blind, or disabled, and must meet certain requirements pertaining to income and assets.  42 U.S.C. § 1382(a).  The only question in this case is whether the ALJ

---

[4] This fourth alleged error arose, according to Morin, because the hypothetical question the ALJ posed to the VE incorporated an RFC that was flawed, due to the ALJ's failure to properly evaluate the opinion in the Mental RFC Questionnaire signed by Diaz and Dr. Lerner.

committed a legal or factual error in determining that Morin was
not disabled.

    For the purpose of determining eligibility for supplemental
security income,

> [a]n individual shall be considered to be disabled for
> purposes of this subchapter if he is unable to engage
> in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment
> which can be expected to result in death or which has
> lasted or can be expected to last for a continuous
> period of not less than 12 months. . . .

42 U.S.C. § 1382c(a)(3)(A).  Moreover,

> [f]or purposes of subparagraph (A), an individual
> shall be determined to be under a disability only if
> his physical or mental impairment or impairments are
> of such severity that he is not only unable to do his
> [her] previous work but cannot, considering his age,
> education, and work experience, engage in any other
> kind of substantial gainful work which exists in the
> national economy, regardless of whether such work
> exists in the immediate area in which he lives, or
> whether a specific job vacancy exists for him, or
> whether he would be hired if he applied for work
> . . . .

42 U.S.C. § 1382c(a)(3)(B).

    To decide whether a claimant is disabled for the purpose of
determining eligibility for SSI benefits, an ALJ is required to
employ a five-step process.  See 20 C.F.R. § 416.920.

> The steps are: 1) if the [claimant] is engaged in
> substantial gainful work activity, the application is
> denied; 2) if the [claimant] does not have, or has not
> had within the relevant time period, a severe
> impairment or combination of impairments, the
> application is denied; 3) if the impairment meets the

conditions for one of the "listed" impairments in the
Social Security regulations, then the application is
granted; 4) if the [claimant's] "residual functional
capacity" is such that he or she can still perform
past relevant work, then the application is denied; 5)
if the [claimant], given his or her residual
functional capacity, education, work experience, and
age, is unable to do any other work, the application
is granted.

Seavey, 276 F.3d at 5 (citing 20 C.F.R. § 416.920).

The claimant bears the burden of proving that he is

disabled.  See Bowen v. Yuckert, 482 U.S. 137, 146 (1987).  He

must do so by a preponderance of the evidence.  See Mandziej v.

Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v.

Schweiker, 530 F. Supp. 808, 810-11 (D. Mass. 1982)).  Finally,

> [i]n assessing a disability claim, the [Commissioner]
> considers objective and subjective factors, including:
> (1) objective medical facts; (2) [claimant]'s
> subjective claims of pain and disability as supported
> by the testimony of the claimant or other witness; and
> (3) the [claimant]'s educational background, age, and
> work experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of HHS, 797

F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of HHS, 690

F.2d 5, 6 (1st Cir. 1982)).

B. Morin's Argument

When the ALJ determined Morin's RFC, the record before him

included medical opinions contained in: (1) Dr. Gustavson's

March, 2012, Mental Health Evaluation Report, which was based

upon an examination; (2) the August, 2012, Mental RFC

Questionnaire that was signed by Diaz and Dr. Lerner, who had each treated Morin for at least six months; and (3) Dr. Beaton's September, 2012, Mental RFC Worksheet, which was based upon his review of Morin's mental-health records.[5]  In his decision, the ALJ: (1) afforded great weight to Dr. Gustavson's opinion, <u>see</u> Tr. 12; (2) afforded little weight to the opinion in the questionnaire signed by Diaz and Dr. Lerner (hereinafter "Diaz/Lerner opinion"), <u>see</u> <u>id.</u>; and (3) gave Dr. Beaton's opinion "only limited weight," <u>id.</u>  The manner in which the ALJ handled the Diaz/Lerner opinion requires that this case be remanded.

In his decision, the ALJ referred to "the opinion [o]f Counselor Diaz whose statement is countersigned by Dr. Lerner." Tr. 12.  While the ALJ used the term "countersigned," Morin's counsel's letter of transmittal actually described the questionnaire containing the Diaz/Lerner opinion as being "co-signed" rather than "countersigned" by Dr. Lerner.  <u>See</u> Tr. 344.

In reliance upon his characterization of Dr. Lerner as a countersigner of Diaz's opinion rather than a co-author, and his determination "that [Diaz] is not an acceptable medical source within the meaning of the Social Security Act," Tr. 12, the ALJ

---

[5] The record also included Dr. Landerman's March 2012, Psychiatric Review Technique results, but Dr. Landerman's opinions played no role in the ALJ's RFC assessment.

mentioned, but did not apply, the so-called treating-source
rule, see 20 C.F.R. §§ 404.1527(c)(2) & 416.927(c)(2), to the
Diaz/Lerner opinion.  Substantively, the ALJ criticized that
opinion as lacking objective measures to support its
conclusions, and criticized the medical evidence underlying it
as inferior to the evidence underlying Dr. Gustavson's opinion.
That evidence includes, among other things, "mental status
testing [that] reveal[ed] a score of 29/30," id.

    The court cannot endorse the manner in which the ALJ
discounted Dr. Lerner's participation in the preparation of the
Diaz/Lerner opinion, an analytical move that allowed him to
avoid applying the treating-source rule to that opinion.  Apart
from using the word "countersigned," the ALJ offered no reason
for not considering the Diaz/Lerner opinion to be, or at least
to include, the opinion of a treating source.  The record
reveals that Dr. Lerner began seeing Morin in September of 2011,
and saw him at least ten times before he signed the Diaz/Lerner
opinion.  Four of Dr. Lerner's sessions with Morin took place
after he referred Morin to Diaz, which means that for
approximately six months, Dr. Lerner and Diaz were both treating
Morin.  In short, Dr. Lerner was indisputably a treating source,
and there is nothing in the record that even remotely suggests
that he signed the Diaz/Lerner opinion in any capacity other

14

than as a treating source.  Consequently, the ALJ erred by
failing to apply the treating-source rule to that opinion.  That
warrants a remand.

Without meaning to dictate the outcome of a proper
consideration of the Diaz/Lerner opinion on remand, the court
offers two observations.  First, when deciding to give great
weight to Dr. Gustavson's opinion, the ALJ relied in part on the
fact that Dr. Gustavson's mental-status testing of Morin
"revealed a score of 29/30."  Tr. 12.  However, neither the
ALJ's decision nor Dr. Gustavson's report gives any indication
of what a score of 29/30 actually means, which certainly limits
the evidentiary value of that score.  Moreover, by the time the
Diaz/Lerner opinion was issued, Diaz and Dr. Lerner had, between
them, given Morin no fewer than twenty-five mental-status exams.
So, if Dr. Gustavson's mental-status testing bolsters the
supportability of her opinion, it is difficult to see how the
testing that Diaz and Dr. Lerner conducted does not do the same
for their opinion.  Second, the court notes, but leaves for
consideration on remand, two facts: (1) Dr. Gustavson saw Morin
once, for sixty minutes, see Tr. 336, about a month before his
suicide attempt in April of 2012; and (2) Dr. Lerner spent more
than six and one half hours with Morin, see Tr. 249, 265, 280,
308, 312, 315, 318, 322, 371, 407, over the course of ten office

15

visits, two of which post-dated Morin's suicide attempt. Both
the length and scope of Dr. Lerner's treatment relationship with
Morin and the testing that underlies the Diaz/Lerner opinion
must be factored into a proper assessment of the weight that
should be given to that opinion.

### Conclusion

For the reasons detailed above, the Acting Commissioner's
motion for an order affirming her decision, document no. 12, is
denied, and Morin's motion to reverse the decision of the Acting
Commissioner, document no. 10, is granted to the extent that the
case is remanded to the Acting Commissioner for further
proceedings, pursuant to sentence four of 42 U.S.C. § 405(g).

SO ORDERED.

_____
Landya McCafferty
United States District Judge

January 23, 2014

cc:  Raymond J. Kelly, Esq.
     Robert J. Rabuck, Esq.